IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TRANSCRIPT OF PROCEEDINGS

```
----------------------------x
                             :
UNITED STATES OF AMERICA,    :       CRIMINAL ACTION
                             :       NO. 2:13-CR-00320
vs.                          :
                             :
REGINALD B. BENNETT,         :       December 30, 2013
                             :
         Defendant.          :
                             :
----------------------------x
```

DETENTION HEARING

BEFORE THE HONORABLE DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States:        MR. ERIK S. GOES
                              Assistant U.S. Attorney
                              300 Virginia Street, East
                              Charleston, WV  25301

For the Defendant:            MR. LEX A. COLEMAN
                              Assistant Federal Public
                              Defender
                              300 Virginia Street, East
                              Charleston, WV  25301

Court Reporter:               Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography; transcript
produced by computer.

1          <u>I N D E X</u>

2

3    <u>GOVERNMENT'S WITNESS</u>:                          <u>PAGE</u>

4    **OWEN MORRIS**

5          Direct Examination (By Mr. Goes) . . . . . .  8

6          Cross Examination (By Mr. Coleman) . . . . .  19

7

8    <u>DEFENDANT'S WITNESSES</u>:                          <u>PAGE</u>

9    **CHARLES WHITTINGTON**

10          Direct Examination (By Mr. Coleman) . . . .  40

11

12   **JENNIFER ALLEN**

13          Direct Examination (By Mr. Coleman) . . . .  52

14          Cross Examination (By Mr. Goes) . . . . . .  57

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURT:  All right.  We're here in the matter of the *United States of America* vs. *Reginald B. Bennett*, Case Number 2:13-CR-00320.

Would counsel please note their appearances for the record, please.

MR. GOES:  May it please the Court, Erik Goes on behalf of the United States of America.

MR. COLEMAN:  Lex Coleman, Your Honor, on behalf of Mr. Bennett who's seated in the courtroom to my right.

THE COURT:  Thank you, sir.

Mr. Bennett, will you please rise and take an oath.

(Defendant sworn)

THE COURT:  Mr. Bennett, you have the right to remain silent.  Anything you say may be used against you. Would you please state your full name for the record.

THE DEFENDANT:  Reginald Bernard Bennett.

THE COURT:  And, Mr. Bennett, have you received a copy of the indictment?

THE DEFENDANT:  Yes.

THE COURT:  Have you read the indictment?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand the indictment and what you are charged with?

THE DEFENDANT:  Yes.

1          THE COURT:  Have you had an opportunity to discuss

2     the charges in the indictment with your attorney?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Would you like for me to read the

5     indictment out loud to you or do you waive the reading of

6     the indictment?

7          THE DEFENDANT:  Yeah, I waive the reading of the

8     indictment.

9          THE COURT:  You waive it?

10          THE DEFENDANT:  Yes.

11          THE COURT:  All right.  Are you ready to enter a

12     plea?

13          THE DEFENDANT:  Yes.

14          THE COURT:  As to the charge contained in the

15     indictment, how do you plead?

16          THE DEFENDANT:  Not guilty.

17          THE COURT:  Mr. Bennett, your case is assigned to

18     Judge Johnston.  Your trial is scheduled for February the

19     25th, 2014, at 9:00 a.m. also here in Charleston.  There

20     will be a hearing on pre-trial motions on February the 6th,

21     2014, at 2:00 p.m. also here in Charleston.

22      Thank you, sir.  You may be seated.

23      The parties have elected the standard discovery

24     requests.  Other pre-trial motions are due on January the

25     27th, 2014.  Proposed jury instructions and proposed *voir*

*dire* questions are due on February 14th, 2014.  And a

witness list is due in chambers on February 21st, 2014.  Be

sure that Judge Johnston's law clerk gets a copy of all

motions at the time the originals are filed in the Clerk's

Office.

     Counsel are directed to give 30 days notice to the

United States Marshal's Service via writ or ASR for the

production of out-of-district in-custody defendants, for

witnesses, and to cancel those requests for production if

the appearance becomes unnecessary.

     Have the parties had an opportunity to review the

Pre-Trial Services Report?

          MR. GOES:  Yes, Your Honor.

          MR. COLEMAN:  Yes, Your Honor.  One moment,

please.

     (Pause)

          MR. COLEMAN:  Thank you, Your Honor.  We have

looked at it.

          THE COURT:  Are there any additions or corrections

to be -- to make on the record?

          MR. COLEMAN:  Obviously, we don't agree with the

assessments at the end.  I would add to it that my client

has been in the area since 2004.  He has been operating two

businesses.  Let me make sure I've got the name right.  The

address mentioned in there, the 190 Hull Avenue, is a

1  combination duplex and store front.  He is in the process

2  under a lease purchase agreement or land purchase agreement

3  of buying that building.  He is operating home maintenance,

4  hardware, and supplies out of it, as well as his home

5  improvement business, which is contracted and go out.

6      The other is actually you go in and can meet with him

7  to do the work on the mobile part of the business or he

8  actually can sell tools, hardware, things of that nature at

9  that address.

10     He's paying -- he is paying the $600 a month for that.

11  He has been involved in a relationship with Jennifer Allen

12  who is present in the courtroom.  Ms. Allen is a nurse.  She

13  owns a residence located on Riverside Drive in South

14  Charleston and also owns the adjacent lot.

15     I've discussed with Ms. Allen if my client would not be

16  allowed to return to his place of business in his own

17  apartment or, or home with that, she has agreed to be a

18  third-party custodian with that and allow him to reside at

19  that residence under home confinement.

20     I'm trying to see if there's anything that's been

21  omitted from the report besides that.  I would submit that

22  his relationship with her and his business do constitute

23  greater ties to the community other than his brother living

24  in the area.  And he has been here for almost an entire

25  decade as a resident and someone lawfully operating a

business.

THE COURT:  All right.  Anything else, Mr. Coleman?

MR. COLEMAN:  No, sir.

THE COURT:  All right.  Thank you.  Those additions will be so noted.

Now, previously the United States had filed a motion for a detention hearing.

Mr. Coleman, do you contest detention at this time?

MR. COLEMAN:  Yes.  I've conferred with my client and he does contest continued detention.

THE COURT:  And do you contest that by way of proffer or testimony?

MR. COLEMAN:  Well, the burden is not on me.

THE COURT:  I understand.

MR. COLEMAN:  Yes, sir.

THE COURT:  So, you want some testimony?

MR. COLEMAN:  Please.

THE COURT:  Mr. Goes, is the Government ready to proceed?

MR. GOES:  We are, Your Honor.

THE COURT:  You may call your first witness, please.

MR. GOES:  The United States calls Detective Morris.

1        THE COURT:  Detective who?

2        MR. GOES:  Morris.

3        MR. COLEMAN:  Your Honor, my understanding is that

4   both detectives who were involved in the original arrest as

5   well as the arrest on the federal warrant are present.  I

6   would invoke the rule, or at least ask the Court to

7   sequester the witnesses in case I need to question the other

8   one the Government is not calling.

9        THE COURT:  Who is the other detective?

10       MR. GOES:  It's Detective Whittington.  He's

11  present in the courtroom.

12       THE COURT:  Whittington?

13       MR. GOES:  Whittington.

14       THE COURT:  W-h-i-t-t-i-n-g-t-o-n?

15       MR. GOES:  Yes, Your Honor.

16       THE COURT:  All right.

17     Detective Whittington, will you step outside and we'll

18  call you when you're needed to testify, sir.  Thank you,

19  sir.

20     Detective Morris, will you come forward, please.

21       **OWEN MORRIS**, GOVERNMENT'S WITNESS, SWORN

22                   DIRECT EXAMINATION

23  BY MR. GOES:

24  Q.   Please state your name.

25  A.   Owen B. Morris.

1  Q.   Where do you work?

2  A.   The Charleston Police Department.

3  Q.   For how long?

4  A.   Approximately seven years.

5  Q.   What is your current duty assignment?

6  A.   I'm currently assigned to the Special Enforcement Unit.

7  Q.   What does that do?

8  A.   We are a plain clothes unit with five members.

9  Q.   And what is your primary responsibility with that plain

10  clothes unit, sir?

11  A.   Street-level crime.

12  Q.   Have you ever been involved in felony arrests before?

13  A.   Yes, sir.

14  Q.   How many times?

15  A.   Multiple.

16  Q.   Have you ever worked felony-level cases before?

17  A.   Yes, sir.

18  Q.   Again, how many times?

19  A.   Multiple.

20  Q.   I want to turn your attention to Mr. Reginald Bennett.

21  Are you familiar with that case?

22  A.   Yes, sir.

23  Q.   Are you familiar with the underlying facts of that

24  case?

25  A.   Yes, sir.

1   Q.   Will you tell the Court briefly how you came to be

2   involved in that case?  What happened?

3   A.   On September the 12th, my partner and I were in an

4   unmarked vehicle.  We observed Mr. Bennett on his cell phone

5   while driving on the east end of Charleston.  We called for

6   a line car to have a traffic stop conducted on that vehicle.

7   Q.   What happened next?

8   A.   Mr. Bennett was approached by patrol officers as well

9   as my partner and I.  He, he was eventually asked out of the

10  vehicle at which time he was -- when he was asked out, he

11  stepped out with his left foot, and his left hand came out

12  of the vehicle.  And with his right hand, he reached

13  underneath the seat, the driver's seat at, which time my

14  partner was closer and pulled him from the driver's side.

15  Both of us put his hands on the car.

16      A female patrolman that was there on scene from outside

17  the door could see underneath the seat that there was a

18  handgun.  She yelled out that there was a gun under the

19  seat.  We immediately detained Mr. Bennett.

20  Q.   Was the defendant asked about the gun?

21  A.   Yes, sir.

22  Q.   What, if anything, did the defendant say about the gun?

23  A.   I asked Mr. Bennett if he had a carry concealed permit

24  and he said not for that.

25  Q.   Was a gun secured?

1  A.    Yes, sir.

2  Q.    Do you recall the type it was?

3  A.    It was a .38 Special revolver.

4  Q.    Did you run a criminal background check on the

5  defendant?

6  A.    Yes, sir.

7  Q.    What, if anything, did you learn?

8  A.    He has an armed robbery conviction out of Baltimore,

9  Maryland.

10 Q.    A what type of conviction, sir?

11 A.    Armed robbery.

12 Q.    From what year?

13 A.    I believe it was '94.

14 Q.    Was that information relayed to the defendant in any

15 way?

16 A.    Yes, sir.

17 Q.    Did the defendant say anything about that armed robbery

18 conviction?

19 A.    Yes, sir.  He said that it didn't matter, that it was

20 over 20 years ago.

21 Q.    Was it investigated and learned whether he was pardoned

22 or somehow had his civil rights restored from Maryland?

23 A.    Yes, sir.  On the Triple I it showed no pardon.

24 Q.    Did this defendant make any further admissions with

25 regard to that firearm in front of a state magistrate or a

1   county magistrate?

2   A.   Yes, sir.  During the arraignment, he was explaining

3   that he owned a business and that that was --

4   Q.   Who was explaining, sir?

5   A.   The defendant, Mr. Bennett, was explaining to the

6   magistrate that he owned a business and had ties to the

7   community through that way, and the reason he had the

8   firearm was to protect his business.

9   Q.   That person that had the firearm and admitted the

10  firearm, do you see him here in court?

11  A.   Yes, sir.

12  Q.   Would you identify him, please?

13  A.   He's the gentleman sitting right here to my left in the

14  orange.

15  Q.   Who is that?

16  A.   Reginald Bennett.

17          MR. GOES:  Your Honor, is that sufficient for the

18  record to indicate that he has, in fact, identified the

19  defendant in this case, Mr. Reginald Bennett?

20          THE COURT:  That's sufficient.  Let the record

21  reflect that the witness has identified the defendant,

22  Reginald Bennett.

23  BY MR. GOES:

24  Q.   Was Mr. Bennett charged initially in State, in State

25  Court?

1  A.   Yes, sir.

2  Q.   Was he eventually charged or indicted in Federal Court?

3  A.   Yes, sir.

4  Q.   Upon -- so, a true bill was returned for him by a

5  Federal Grand Jury?

6  A.   Yes, sir.

7  Q.   Was a warrant issued for Mr. Bennett's arrest?

8  A.   Yes, sir.

9  Q.   Was Mr. Bennett, in fact, arrested pursuant to that

10 warrant?

11 A.   Yes, sir.

12 Q.   Now, initially did Mr. Bennett try to turn himself in?

13 A.   Yes, sir.

14 Q.   Will you tell the Court about that, please?

15 A.   We made -- we attempted to make contact with Mr.

16 Bennett on Tuesday directly after the grand jury.

17 Q.   Do you recall the exact date?

18 A.   It was the 17th I believe.

19 Q.   Okay.  Thank you.

20 A.   Yes, sir.  Mr. Bennett was not home at the time.

21 However, he did call Detective Whittington back that evening

22 and asked what we were doing at his apartment.

23      We explained to him that we were, we were in the

24 process of getting a warrant for his arrest in the federal

25 system and that we were going to need him to turn himself

1  in, or we were going to ask for him to turn himself in,

2  which Mr. Bennett asked to do, asked to come in the next day

3  because he worked and it was, it was easier for him to come

4  in the next day.

5  Q.   What happened next?

6  A.   The next day, Mr. Bennett did try to turn himself in.

7  However, the warrant had not been processed and was not in

8  hand.  So, we --

9  Q.   Okay.  Go ahead.

10  A.   We told Mr. Bennett that we couldn't, we couldn't take

11  care of it that day and that we would call him once we had,

12  once we, once we could process the arrest.

13  Q.   When was that warrant eventually in hand?

14  A.   On the 20th.

15  Q.   And what day was that?

16  A.   It was on a Friday.

17  Q.   Explain to the Court what happened on the 20th, please.

18  A.   Detective Whittington actually was able to pick up a

19  copy of the warrant and called Mr. Bennett on the phone and

20  told him that we had the warrant in hand and that we were

21  asking him to come and turn himself in.

22       Mr. Bennett asked Detective Whittington if there was a

23  magistrate on duty.  Detective Whittington said, no, that by

24  the time he had the warrant, it was after hours and that he

25  would not see a magistrate until Monday morning.

1   Mr. Bennett stated that he was not going to sit in jail

2   all weekend and that he was not going to turn himself in

3   with it being Friday night after hours.

4   Q.   What happened next?

5   A.   We made contact with the West Virginia State Police at

6   the Quincy detachment and asked one of their officers,

7   because it was out of our jurisdiction, to go with us to his

8   apartment to try to make contact.

9   Q.   Was contact made?

10  A.   No, sir.  He was not home.

11  Q.   What happened next?

12  A.   While Detective Whittington and I were driving on the

13  east end of Charleston -- we had seen Mr. Bennett on that

14  side of town several times even previously that week.  And

15  we were driving on the east end of Charleston and we saw his

16  black BMW that he had been stopped in the first time sitting

17  in the 1500 block of Dixie Street.

18  Q.   What happened next?

19  A.   Detective Whittington and I set up down the street,

20  watched the BMW.  We made contact with Patrolman Gaylor -

21  he's a canine officer with the police department - and asked

22  him if he would come to our location, that we were going to

23  attempt to find the address that he might be in and try to

24  make contact.  There was only the two of us.  Our other

25  officers were tied up on something different.

1   Q.   Did you eventually make contact with Mr. Bennett?

2   A.   Yes, sir.

3   Q.   When?

4   A.   Prior to Patrolman Gaylor arriving, Mr. Bennett exited

5   the house on the, in the 1500 block of Dixie Street.

6   Because it was only Detective Whittington and I, we made the

7   decision to wait until he was seated in his car.

8        Once he was seated in his car, we pulled -- I pulled --

9   I was driving.  I pulled the van that we were driving in

10  front of his car and we exited and identified ourselves as

11  Charleston policemen.

12  Q.   What happened next?

13  A.   Mr., Detective Whittington opened the driver's side

14  door and told Mr. Bennett to exit the vehicle and lay face

15  down on the ground.

16  Q.   Did Mr. Bennett do that?

17  A.   No, sir.

18  Q.   What happened next?

19  A.   Mr. Bennett sat in the car with his hands up but

20  refused to get out.  He was saying something about the

21  stuff, his stuff that he had.  And Detective Whittington

22  reached in to pull him from the vehicle, at which time I

23  deployed my department-issued taser from outside the

24  driver's door at Mr. Bennett.

25  Q.   Why did you deploy your taser?

1   A.    Due to the circumstances of the warrant, his prior

2   convictions, and the fact that for my safety, Detective

3   Whittington's safety, and the defendant's safety.

4   Q.    What happened after you deployed your taser?

5   A.    Due to the clothes that Mr. Bennett was wearing, the

6   taser didn't make complete contact, which makes it less

7   effective.  Detective Whittington continued to pull him from

8   the vehicle, at which time I stripped the first cartridge

9   and placed a second cartridge on the taser which I deployed.

10  Q.    What happened next?

11  A.    After deploying the second, the second cartridge of the

12  taser, we were able to gain compliance with Mr. Bennett and

13  he was placed into custody.

14  Q.    Why did you deploy a taser a second time?

15  A.    Because the first one was, was not effective.  So, I

16  deployed the second cartridge.

17  Q.    What was Mr. Bennett doing or saying at this time?

18  A.    He wasn't really saying anything.  He just wouldn't

19  comply.  He had his hands up under him.  He wouldn't, he

20  wouldn't lay face down on the ground and wouldn't allow

21  himself to be handcuffed.

22  Q.    Why did that cause you to have any fear?

23  A.    We didn't know what he had on his person.

24  Q.    After the second -- after the taser was deployed the

25  second time, were you able to gain custody of Mr. Bennett at

1  that time?

2  A.    Yes, sir.

3  Q.    Was Mr. Bennett subsequently charged?

4  A.    Yes, sir.

5  Q.    Tell the Court about that, please.

6  A.    We charged him with obstructing through our municipal

7  court.

8  Q.    Why did you charge him through municipal court?

9  A.    We run all our misdemeanors through municipal court.

10 It's our department's policy that if we, if we use force

11 during an arrest, we have to charge.

12 Q.    Do you consider that force was used during the course

13 of this arrest?

14 A.    Yes, sir.

15 Q.    The same individual that you've indicated force was

16 used on in this particular incident, is that the same

17 individual you previously identified?

18 A.    Yes, sir.

19 Q.    Is that obstruction charge still pending in municipal

20 court?

21 A.    Yes, sir.

22        MR. GOES:  That's all the questions I have for

23 this witness.  Thank you.

24        THE COURT:  Any cross, Mr. Coleman?

25              CROSS EXAMINATION

1   BY MR. COLEMAN:

2   Q.   Let's fill in a few blanks, Detective Morris.

3   A.   Yes, sir.

4   Q.   You-all searched the vehicle after his last arrest;

5   right?

6   A.   After the -- after serving the warrant, sir?

7   Q.   Uh-huh.

8   A.   Yes, sir.  I did not.  Detective Whittington did.

9   Q.   But he was searched is my point; correct?

10  A.   He was searched?

11  Q.   Correct.

12  A.   Yes, sir.

13  Q.   And by "he," his person; right?

14  A.   Yes, sir.

15  Q.   His clothing?

16  A.   Yes, sir.

17  Q.   And his vehicle?

18  A.   Yes, sir.

19  Q.   There was no contraband found, was there?

20  A.   No, sir.

21  Q.   There was no weapon found?

22  A.   No, sir.

23  Q.   There was no ammunition?

24  A.   No, sir.

25  Q.   Okay.  And as I heard you describe, you-all pulled up

1    in a van in front of him; correct?

2    A.    Yes, sir.

3    Q.    This was an unmarked van?

4    A.    Yes, sir.

5    Q.    And you were not in uniform.  You were dressed in some

6    type of plain clothes like you are now?

7    A.    Yes, sir.

8    Q.    Because your unit is undercover; correct?

9    A.    Yes, sir.  We're plain clothes.

10   Q.    Okay.  And I, I'm not quibbling with your

11   representation that you identified yourself to him.  Right?

12   A.    Yes, sir.

13   Q.    This was on a Friday.  It was cold.  You had a coat on.

14   Correct?

15   A.    No, sir.

16   Q.    No coat?

17   A.    I don't recall.  I can't remember if I had a coat on or

18   not.  However, I had my badge hanging.  My badge was clearly

19   displayed.

20   Q.    All right.  Well, I want to get back to that.  But what

21   time of day was this?

22   A.    This was approximately 10:00 at night.

23   Q.    At night?

24   A.    Yes, sir.

25   Q.    Okay.  And -- but you maintain you-all had a badge or

1  necklace, both of you did?

2  A.    Yes, sir.

3  Q.    Okay.  And as I understood your description of how this

4  came together, he had his hands up sitting in the car; --

5  A.    Yes, sir.

6  Q.    -- right?  Where you could see them?

7  A.    Yes, sir.

8  Q.    He wasn't furtively reaching around under anything, the

9  most recent arrest where the taser was used; correct?

10  A.    Yes, sir, correct.

11  Q.    And I understood you to say that Whittington -- am I

12  saying that right?

13  A.    Yes, sir.

14  Q.    Whittington was reaching to get his arm across the

15  passenger's seat?

16  A.    No, sir.

17  Q.    Not?  Where was he?

18  A.    He was behind -- he was at the driver's door.

19  Q.    Okay.  So, both you-all were on the same side?

20  A.    Yes, sir.

21  Q.    So, he's reaching in with his right arm; is that

22  correct?

23  A.    I'm -- I don't understand your question, sir.

24  Q.    You were there.  Pretend where my client is sitting is

25  in a car instead of in a chair in a courtroom.

1   A.   Uh-huh.

2   Q.   Detective Whittington was reaching under his armpit of

3   his left arm?

4   A.   I'm not sure how Detective Whittington grabbed him.

5   Q.   You just know he was grabbing him?

6   A.   I know he was trying to pull him from the car, yes,

7   sir.

8   Q.   All right.  Were you behind him or in front of him?

9   A.   I was in front of him.

10  Q.   So, there's something going on behind you with this

11  driver of a car you've stopped; right?

12  A.   No, sir.

13  Q.   No?

14  A.   I was in front of the defendant and Detective

15  Whittington.

16  Q.   Right.  So, Whittington is making physical contact with

17  him while he was still seated in the vehicle and was

18  directly behind you.  Is that not correct?

19  A.   I'm not understanding, sir.  I'm not --

20  Q.   I know.  So, help me out here because I don't want to

21  belabor this.  I want to develop what you've already talked

22  about.  The car door was open; right?

23  A.   Yes, sir.

24  Q.   The driver's car door?

25  A.   Yes, sir.

1  Q.   Okay.  And my client's hands were up; right?

2  A.   Yes, sir.

3           MR. COLEMAN:  If I can approach the witness, Your

4  Honor.

5           THE COURT:  You may approach.

6  BY MR. COLEMAN:

7  Q.   Let me get back to the microphone.  Now, off mic I

8  brought you a pad that's got a very crude, rudimentary

9  drawing from up above looking down.  It's intended to depict

10 a car and someone sitting in the driver's side of the car

11 with the driver's side door open.

12 A.   Okay, sir.

13          THE COURT:  Mr. Coleman, before you proceed,

14 Mr. Goes, would you like to see this diagram as he goes

15 through it?

16          MR. GOES:  No.  I'll -- I'm --

17          THE COURT:  Okay.

18          MR. GOES:  Depending on where the questioning

19 goes, I kind of saw it where Mr. Coleman was drawing it out,

20 Your Honor.

21          THE COURT:  All right.  You may proceed,

22 Mr. Coleman.

23 BY MR. COLEMAN:

24 Q.   Take the pen I left up there with you, please.  And it

25 doesn't have to even be to scale or an artist's rendering.

1  Give me an idea where you and Detective Whittington were
2  positioned.
3  A.    Okay.
4        (Pause)
5            MR. COLEMAN:  If I can approach again, Your Honor.
6            THE COURT:  You may.
7  BY MR. COLEMAN:
8  Q.    Okay.  I didn't get this from your direct.  You were
9  actually outside the driver's side door?
10 A.    Yes, sir.
11 Q.    And the door separated you and Detective Whittington?
12 A.    Yes, sir.
13 Q.    So, it wasn't all three of you all facing the same
14 direction.  You're facing the driver --
15 A.    Yes, sir.
16 Q.    -- in front of the car with the door in between?
17 A.    Yes, sir.
18 Q.    Whittington is behind it trying to get my client out of
19 the car?
20 A.    Yes, sir.
21 Q.    Again, his hands are up?
22 A.    Yes, sir.
23 Q.    Was the window down?
24 A.    I don't recall, sir.  The door was open.
25 Q.    Right.

1  A.   I don't recall if the window was down or if it was

2  shut.

3  Q.   All right.  You deployed a taser; --

4  A.   Yes, sir.

5  Q.   -- right?  And the last one I saw had a pistol grip,

6  and you've got the wires and the hooks; --

7  A.   Yes, sir.

8  Q.   -- right?  You're left-handed.  Did you do this from

9  your left hand or your right?

10 A.   My left hand.

11 Q.   Okay.  So, did you reach over inside the V of the door

12 or did you -- were you back on your side of the door when

13 you deployed it?

14 A.   I was right where I showed you there.  It went between

15 the door and the A-pillar.

16 Q.   Okay.  Did you have to put your hand through?

17 A.   No, sir.

18 Q.   All right.  So, you were able to make the shot from

19 where you were and it hit him in the leg?

20 A.   No, sir.

21 Q.   It did not?

22 A.   No, sir.

23 Q.   Where did it hit him?

24 A.   The first cartridge, sir, where the car is low, I was

25 above the door.  So, I did not have to stick my hand through

1   that.

2   Q.   Okay.

3   A.   The taser was deployed to hit Mr. Bennett in the torso.

4   Q.   Where did it hit him?

5   A.   One, one probe went into the zipper of his coat --

6   Q.   Uh-huh.

7   A.   -- and caused it not to be effective because it wasn't

8   touching him.  I don't know with the second one went.  Once

9   we got out onto the ground and he was taken into custody, it

10  was free-hanging.

11  Q.   How many probes when you fire that thing go out?

12  A.   Two.

13  Q.   Just two?

14  A.   Per cartridge.

15  Q.   Okay.  And your testimony is you only deployed two?

16  A.   Cartridges.

17  Q.   Right.

18  A.   Yes, sir.  That's all I carry.

19  Q.   All right.  So, if one hit the coat and didn't really

20  take, there should have been three marks on his body where

21  it hit.  There are only two probes; right?

22  A.   I'm not, I'm not understanding what you're asking me.

23  Q.   The hooks that deliver the charge --

24  A.   Okay.

25  Q.   -- when you fire a taser, you just said four go out.

1    A.    No, sir.

2    Q.    No?

3    A.    Two probes per cartridge.

4    Q.    Okay.

5    A.    You only fire one cartridge at a time.

6    Q.    Okay.  And to make sure I understand you right, you

7    only fired two cartridges that day?

8    A.    Yes, sir.

9    Q.    So, a total of four --

10   A.    Total, yes.

11   Q.    -- probes total should have gone out?

12   A.    Yes, sir.

13   Q.    Why are there four probe injuries on the left side of

14   his leg?

15   A.    I don't know, sir.  Two probes went into his leg when

16   the second cartridge was fired outside the car.

17   Q.    Right.  And a probe is a point; right?  It's a wire --

18   A.    Yes, sir.

19   Q.    -- that's been connected to it?

20   A.    Yes, sir.

21   Q.    And the impact point should make one injury; correct?

22   A.    Per probe?

23   Q.    Right.

24   A.    If it makes contact with the skin, yes, sir.

25   Q.    Right, okay.  All right.  Well, without getting

1   distracted with all the situation of forensics, he called on

2   a Tuesday to try to turn himself in and you-all weren't

3   ready?

4   A.   Yes, sir.

5   Q.   He made another effort on Wednesday?

6   A.   No, I'm -- I stand corrected, sir.  He called Tuesday

7   and asked if he could turn himself in Wednesday.

8   Q.   Uh-huh.

9   A.   Yes, sir.  He was not -- he was not ready to turn

10  himself in Tuesday because of something to do with his

11  schedule.  He wanted to wait until Wednesday.

12  Q.   Okay.  But you-all weren't ready either?

13  A.   Right.

14  Q.   And you weren't ready on Wednesday?

15  A.   Yes, sir.

16  Q.   Or Thursday?

17  A.   Yes, sir.

18  Q.   It wasn't until after 5:00 on Friday you-all were

19  ready?

20  A.   Yes, sir.

21  Q.   Okay.  Only this time he wasn't; --

22  A.   Right.

23  Q.   -- right?

24  A.   Correct, sir.

25  Q.   And he wasn't refusing to turn himself in at some other

1    time.  He showed a reluctance of just sitting in a jail

2    since everybody waited to get ready after the last

3    magistrate had left; right?

4    A.    That's when the warrant came down, sir.

5    Q.    Okay.  The warrant that was issued on Tuesday?

6    A.    No.

7    Q.    It's not going to show that in the court file, huh?

8    A.    I'm not understanding exactly what you're asking me,

9    sir.  We did --

10   Q.    Okay.

11   A.    We had grand jury on that Tuesday.

12   Q.    I'm sorry.  It's genuinely not my intent to confuse

13   you, Detective.  My point is for four days, even being ready

14   and wanting to turn himself in, you-all weren't ready to

15   take him into custody until after 5:00 on Friday; right?

16   A.    Until we had the warrant, yes, sir.

17   Q.    Then at 10:00 at night on Friday an unmarked van pulls

18   in front of his car on the east side; correct?

19   A.    Yes, sir.

20   Q.    You-all didn't operate any blue lights?

21   A.    We did not have lights on that vehicle.

22   Q.    Right.  And you got out yelling you were detectives and

23   officers and you may have had something around your neck,

24   but it was dark and at night; correct?

25   A.    Yes, sir.

1  Q.   And this was on Dixie Street?

2  A.   Yes, sir.

3  Q.   What is it?  18- or 1959 Dixie Street?  1529 Dixie

4  Street?

5  A.   1500 block.

6  Q.   Does that sound right?

7  A.   Yes, sir.

8  Q.   And then you explained how things went.  Back in

9  September, the charged offense conduct, he didn't resist

10 then when he was arrested, did he?

11 A.   No, sir.

12 Q.   Right.  And, in fact, he was, had a state case going

13 for a while and was out on bond without incident; correct?

14 A.   Yes, sir.

15 Q.   Then that was dismissed; correct?

16 A.   I'm not sure, sir.

17 Q.   Well, it was a case Matt Victor handled and it was

18 dismissed.  You don't know that?

19 A.   I don't know that first-hand, no, sir.

20 Q.   But he was stopped for having a cell phone; right?

21 A.   For using a cell phone while driving.

22 Q.   For using a cell phone?

23 A.   Yes, sir.

24 Q.   That's what you observed?

25 A.   Myself and Detective Whittington, yes, sir.

1   Q.   And, of course, you-all don't have in-car video --

2   A.   No, sir.

3   Q.   -- in your vehicles, do you?

4   A.   No, sir, we do not.

5   Q.   And since you-all didn't effect the stop with blue

6   lights, you-all don't have any tape of whether he had it or

7   not; right?

8   A.   That day the stop was effected with blue lights, sir.

9   Q.   It was?

10  A.   Yes, sir.

11  Q.   Okay.  Have you reviewed the in-car video?

12  A.   No, sir.

13  Q.   Has anyone checked to see if the phone was in use at

14  the time you maintain you saw him?

15  A.   The blue -- the car with the blue lights was not there

16  when we saw him using his cell phone.

17  Q.   Yeah.  But did anybody check to see if a few seconds

18  before he was using the phone?

19  A.   No, sir.

20  Q.   Where did you-all first notice him with the cell phone?

21  Where were you?

22       MR. GOES:  If it please the Court, I object to the

23  relevance of this.  While I think Mr. Coleman is entitled to

24  wide latitude with regard to these questions, this

25  actually -- where the cell phone was used just really

1    doesn't seem like it's going to go to the actual detention

2    issue here.  And even for an underlying attack on the

3    defendant's credibility, we're very far afield from the

4    principles at work and whether he should be released or

5    detained.

6           THE COURT:  I agree, Mr. Coleman.  This is a

7    detention hearing.  This is not a preliminary.  This is a

8    detention hearing.

9           MR. COLEMAN:  You're absolutely right.

10          THE COURT:  I'm giving you a little leeway because

11   you do have a right to get into the nature and circumstances

12   of the offense.  However, I think you are going a little bit

13   too far.  So, I'm going to sustain this objection unless you

14   can tell me a reason why you should continue going along

15   these lines of questioning.

16          MR. COLEMAN:  I'm going to try.  He developed this

17   on direct as to why he stopped him.  I'm not going to turn

18   this into any type of suppression hearing.  All I want to

19   know is where he saw him.  And I'm moving on from that fact.

20   But the Government brought it up.

21      I'm simply trying to see if I can rely on what this man

22   is telling me.  He's just said he's confused about things.

23   I'm surprised he's confused about it.  He's a detective with

24   the SEU.  He's one of the two officers personally involved

25   not in one incident but two purportedly involving my client.

1   And he suggests, "We stopped him because he had a cell -- he

2   was using a cell phone."  I'm not going into all the

3   forensics.  I'd just like to know where he said he saw him.

4          THE COURT:  Well, I'm going to give you a little

5   leeway.

6          MR. COLEMAN:  Yes, sir.

7          THE COURT:  But, like I say, I don't think this is

8   relevant for the purpose of a detention hearing.  But if

9   Mr. Goes brought that up, I'm going, I'm going to allow you

10  to ask some questions, but don't dwell on that.

11         MR. COLEMAN:  Yes, sir.

12         THE COURT:  Like I said, this is not a preliminary

13  hearing.

14         MR. COLEMAN:  I appreciate that.

15         THE COURT:  All right.

16  BY MR. COLEMAN:

17  Q.   Now, Officer, where did you see the phone?

18  A.   The intersection of Lee and Pennsylvania.

19  Q.   That's where you were or where he was?

20  A.   That's where we both were.

21  Q.   Okay.

22         MR. COLEMAN:  Thank you.

23         THE COURT:  Yes, sir.

24  BY MR. COLEMAN:

25  Q.   Now, the gun that was found in the vehicle was a

1   revolver?

2   A.    Yes, sir.

3   Q.    You didn't say whether or not it was loaded.

4   A.    I did not say, no.  It was loaded.

5   Q.    It was?

6   A.    It was loaded.

7   Q.    Thank you.  Was this a five- or a six-round cylinder on

8   that gun?

9   A.    I know that the gun was loaded.  However, I did not

10  take the gun out of the car and I did not put the gun into

11  evidence.  I don't know the answer to that question.

12  Q.    So, you know it's loaded because somebody else told

13  you, not from your personal observation?

14  A.    Yes, sir.

15  Q.    Again, do you even know if it's a five- or a six-round

16  gun?

17  A.    I personally do not.

18  Q.    Okay.  Has anybody told you it was anything else?

19  A.    I don't believe so.

20        MR. COLEMAN:  Your Honor, I'm going to move to

21  admit the diagram as Defendant's 1.

22        MR. GOES:  No objection.

23        THE COURT:  Any objection?

24        MR. GOES:  No, Your Honor.  Thank you.

25        THE COURT:  We'll have that marked as Defendant's

1  Exhibit Number 1 and it will be admitted into evidence.

2  BY MR. COLEMAN:

3  Q.    Now, you testified on direct that you ran a Triple I on

4  my client?

5  A.    Yes, sir.

6  Q.    And for the Court's benefit, tell him what that is.

7  A.    It's a criminal history.

8  Q.    Why is it called Triple I, if you know?

9  A.    I do not.

10  Q.    Okay.  Running that report, though, you saw that the

11  only conviction he had between that arrest was the 1994

12  armed robbery; correct?

13  A.    I believe that's correct.

14  Q.    All right.  And, now, when you talked about deploying

15  the taser, you base that on his criminal history, although

16  back in '94 you said there was an arrest warrant and the

17  nature of the underlying offense?  You and Whittington were

18  involved in the underlying offense; right?

19  A.    Correct.

20  Q.    So, you-all actually knew because you-all had done the

21  stop; right?

22  A.    Yes, sir.

23  Q.    And the only thing he was guilty of doing was getting

24  out of a car and (recording inaudible) you maintain.  And

25  later, a search of the car revealed there was a firearm;

1   correct?

2   A.    Yes, sir.

3   Q.    There was no attempt to deploy the firearm; right?

4   A.    Not that he went through with, no, sir.

5   Q.    Right.  Well, not that he went through with.  He didn't

6   point a gun at you, did he?

7   A.    No, sir.

8   Q.    Didn't point a gun at anybody else?

9   A.    No, sir.

10  Q.    Okay.  So, it wasn't a matter of not going through with

11  it.  He didn't do it.  Do you agree?

12  A.    Yes, sir.

13  Q.    Okay.  So, other than the categorical characterization

14  of that as a crime of violence, his possessing a gun, you've

15  already established he didn't use it and he didn't try and

16  flee at that time; right?

17  A.    Correct.

18  Q.    Now, you guys -- he gave residences not just -- well,

19  let's go to the 190 Hull which he gave as his residence

20  address.  You-all have no knowledge of any crimes being

21  committed at that location, do you?

22  A.    No, sir.

23  Q.    As far as Ms. Allen, you have no knowledge of her being

24  involved in any criminal activity, do you?

25  A.    No, sir.

1  Q.   Or of any criminal activity taking place at her

2  residence on Riverside Drive in South Charleston, do you?

3  A.   No, sir.

4  Q.   In fact, you have no information at all that would

5  suggest that she is in any way inappropriate or unqualified

6  to be a third-party custodian for my client, do you?

7  A.   No, sir.

8  Q.   And, again, other than the stop on September 12th of

9  2013, you have -- well, prior to that, you have no reason to

10  believe he was involved in any criminal activity of any kind

11  before that once he had moved to West Virginia; correct?

12  A.   That's correct.

13  Q.   Now, he represented he was doing home improvements, had

14  a job, was trying to operate a business.  Nothing in your

15  investigation of him indicated that any of that was false,

16  did it?

17  A.   No, sir.

18  Q.   And going back to the date with the taser when he was

19  arrested on December 20th, he told you-all he had a cat back

20  at his house he had to let out, right, that was locked in

21  without food and water?

22  A.   No, sir, I don't recall any conversation with, between

23  myself and Mr. Bennett about a cat.

24  Q.   You don't recall him complaining about needing to let

25  the cat out?

1   A.   No, sir, I don't recall that.

2   Q.   Okay.  And as far as the September 12, I realize there

3   was a gun found in the vehicle; right?

4   A.   Yes, sir.

5   Q.   You've got no fingerprints or anything indicating he

6   ever held it in his hand?

7   A.   I'm not sure if that's back from the lab or what the

8   status of that is.

9   Q.   Did you-all test him for GSR?

10   A.   No, sir, I don't believe we did.

11   Q.   Either one of you?

12   A.   I don't believe so.

13   Q.   All right.  Is that not SOP when you stop somebody with

14   a gun?

15   A.   Not all the time, no, sir.

16   Q.   What determines when you do it?

17   A.   Well, a lot of times if there's a shots-fired call or a

18   shooting and we stop a vehicle coming from that area and

19   they have a gun in there, then we'll do GSR to prove if they

20   were part of that shots-fired or may be part of the

21   shooting.

22   Q.   Okay.  But when you find somebody with a gun, you don't

23   do that routinely?

24   A.   Not routinely, no, sir.

25   Q.   Did you prepare the incident report for this?

1   A.   Yes, sir.

2   Q.   Did your partner prepare a separate one?

3   A.   Yes, sir.

4   Q.   And they were reviewed and approved by your supervisor?

5   A.   Yes, sir.

6   Q.   Who is that?

7   A.   Sergeant Eggleton.

8   Q.   Who was the lighted patrol unit that did the stop on

9   the 12th?

10  A.   Patrolman Redden.

11  Q.   Retton?

12  A.   Redden.

13  Q.   Okay.  That's a woman; correct?

14  A.   Yes, sir.

15  Q.   Okay.

16          MR. COLEMAN:  That's all I've got, Your Honor.

17  Thank you.

18          THE COURT:  Any redirect, Mr. Goes?

19          MR. GOES:  No, Your Honor.

20          THE COURT:  Did you say "no"?

21          MR. GOES:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  Detective Morris, you may

23  step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  Thank you, sir.

1          MR. GOES:  The U.S. rests.

2          THE COURT:  You're not going to call Detective

3     Whittington?

4          MR. GOES:  I don't believe it's necessary at this

5     time.

6          THE COURT:  All right.

7          MR. GOES:  Thank you, Your Honor.

8          MR. COLEMAN:  That's all right.  I will, please.

9          THE COURT:  You have to get him.

10         MR. COLEMAN:  Where did he go?

11         THE COURT:  He's out in the lobby.

12       (Pause)

13         THE COURT:  Mr. Whittington, will you come forward

14    and be sworn, sir, right in front of Ms. Lair.

15         **CHARLES WHITTINGTON**, DEFENDANT'S WITNESS, SWORN

16         THE COURT:  Detective Whittington, I'm going to

17    need for you to speak into that mic on the questions that

18    are going to be asked of you.  You're going to be first

19    questioned by Mr. Coleman, the Public Defender representing

20    Mr. Bennett.  Mr. Goes chose not to call you to testify in

21    the Government's case.  So, you're being questioned by Mr.

22    Coleman first.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  All right.  Mr. Coleman.

25                        DIRECT EXAMINATION

1   BY MR. COLEMAN:

2   Q.    Please state your name.

3   A.    Charles Matthew Whittington.

4   Q.    And how are you employed, Mr. Whittington?

5   A.    Charleston Police Department.

6   Q.    What is your rank?

7   A.    I'm a Senior Patrolman.

8   Q.    How long have you been there?

9   A.    Seven years.

10  Q.    Seven years.  Okay.  How long have you been with SEU?

11  A.    Four years, just over four years, about four and a

12  half.

13  Q.    All right.  On September 12 you came into contact with

14  Mr. Bennett; --

15  A.    Yes, sir.

16  Q.    -- correct?  Tell me how that happened.

17  A.    Me and Detective Morris were traveling east on Lee

18  Street and we observed a black in color BMW with tinted-out

19  windows.  We couldn't see through the tint.  The driver's

20  side window was about halfway down.  And we observed a male

21  had a cell phone and his arm held up just above the window.

22  You could see he was on his cell phone.  And that was about

23  at the intersection of Laidley and Lee Street.

24        Detective Morris then --

25  Q.    I'm sorry.  Let me stop you there a minute.  I'm trying

1  to get an idea of your relative positions.  Were you

2  perpendicular or --

3          MR. GOES:  Objection.  It's not relevant to

4  detention, Your Honor, at all.

5          MR. COLEMAN:  I'm asking him what happened.  It

6  goes to the seriousness of the offense.

7          MR. GOES:  It goes to the offense which we already

8  know from the record that has been charged.  This is a

9  suppression issue and a suppression issue only.  This does

10  not go to --

11          MR. COLEMAN:  All I'm asking is who, what, when,

12  where, Your Honor.  I'm not trying to belabor it.

13          THE COURT:  All right.  Again, Mr. Coleman, I'm

14  going to give you a little leeway.

15          MR. COLEMAN:  Yes, sir.  Thank you.

16          THE COURT:  Again, this is a detention hearing.

17  We're not in a suppression hearing.  We're not in a

18  preliminary hearing.  So, I'm going to give you a little

19  leeway.  I don't want you to go in-depth on these type of

20  questions because the issue is whether this defendant should

21  be released on bond or not.

22      Do you need him to repeat the question, Detective

23  Whittington?

24          THE WITNESS:  No, sir.  We were side-by-side the

25  vehicle.

1  BY MR. COLEMAN:

2  Q.   Okay.

3  A.   We were to the left.

4  Q.   And you-all were going which direction?

5  A.   We were traveling east.

6  Q.   So, toward the river?

7  A.   No, no, away from the river, no, going beside of the

8  river.

9  Q.   Okay.  But east?

10  A.   Yes, traveling east.

11  Q.   And you were in the driver's side or the passenger's

12  side?

13       MR. GOES:  If it please the Court, I renew my

14  objection.  This simply has nothing to do with whether this

15  defendant should be detained.  Their positions, their

16  relative positions, their observation lines, who's going

17  east and who's going west simply does not go to any of the

18  18, U.S.C., 3142 factors either on direct or on

19  cross-examination.  It's simply immaterial to the question

20  before the Court.

21       MR. COLEMAN:  It goes to the --

22       THE COURT:  Sustained, sustained.  Move on, Mr.

23  Coleman.

24  BY MR. COLEMAN:

25  Q.   You saw him through a partially rolled down driver's

1  side window?

2  A.   Yes, sir.

3  Q.   From the passenger's side or the driver's side of your

4  vehicle?

5  A.   That would be looking through the passenger's side of

6  our vehicle to the driver's side of his.

7  Q.   Okay, all right.  Continue.  What happened?

8  A.   At that time, Detective Morris notified a line car, car

9  205, to assist in a traffic stop.

10  Q.   Uh-huh.

11  A.   After that contact was made -- I believe the traffic

12  stop was actually initiated around like Jackson Street and

13  Ruffner.  At that time, we exited our vehicle.  The

14  patrolman who initiated the traffic stop approached the

15  driver's side of the vehicle to speak with Mr. Bennett.

16      I walked up behind the patrolman just due to the fact I

17  couldn't see inside the vehicle for officer safety reasons.

18  As I was standing behind the patrolman talking to Mr.

19  Bennett, Detective Morris advised that he thought he saw

20  some marijuana shake sitting on top of a pop can inside the

21  vehicle and walked around and said, "Let's go ahead and have

22  him step out of the vehicle."

23      As he came around to the driver's side, he opened up

24  the driver's side door, said, "Mr. Bennett, step out of the

25  car."  He put his left leg out of the vehicle.  As he was

1  stepping out of the vehicle, with his right arm he began to

2  reach underneath the driver's side seat.

3      At that time, I grabbed his left arm and then removed

4  him from the vehicle and laid him up against the car, placed

5  him in handcuffs.

6      As we were putting cuffs on him at that time, the

7  patrolman from outside the vehicle who initially made the

8  stop advised that there was the grip of a revolver

9  underneath the driver's side seat.

10      I then took him to the rear of the vehicle.  When we

11  got back to the trunk area, Detective Morris asked Mr.

12  Bennett, "Do you have a permit for the pistol?"  And he

13  said, no, he did not.  At that time, he advised that he was

14  a business owner and that's why he carried the firearm.

15  Q.    You heard him say that?

16  A.    Yes.

17  Q.    Okay.  What else happened?  Anything else you remember?

18  A.    We then took him to the station, processed him on

19  carrying a concealed weapon.  Once at the station, we ran a

20  criminal history on him.  And in '94 he had an armed robbery

21  conviction out of Baltimore, Maryland.

22  Q.    All right.

23  A.    He was then charged with felon-in-possession of a

24  firearm.

25  Q.    All right.  You've been a law enforcement officer for

1  seven years?

2  A.   Yes, sir.

3  Q.   And you've just told me everything you think is

4  significant and material about that stop.  Is that a fair

5  statement?

6        MR. GOES:  No, I object to that question, Your

7  Honor.  That, that -- he has not told him everything that's

8  material.  He's answered the questions that he's been asked

9  to do on direct examination based on the questions that he's

10 been asked.

11    Now, Mr. Coleman's question is inappropriate for a

12 number of reasons.  He's trying to box this witness in when

13 he --

14        MR. COLEMAN:  Wait a minute.

15        THE COURT:  Let him finish.

16        MR. COLEMAN:  But it's in front of the witness.

17        THE COURT:  Let him finish.

18        MR. GOES:  He, he -- this is -- he is calling this

19 witness on direct examination.  My objection is specifically

20 he is asking a question that is simply too broad for this

21 witness to answer to say that he's testified to everything

22 relevant and material - I believe those are the words - as,

23 as to the stop.

24    That's not what he was asked to do.  He was simply

25 asked to answer a series of questions by Mr. Coleman.  Mr.

1  Coleman's question is inappropriate because it's overly

2  broad.  That's the exact nature of my objection.

3        THE COURT:  Sustained.  Objection is sustained.

4  Move on, Mr. Coleman.

5  BY MR. COLEMAN:

6  Q.   What else about that stop do you consider significant,

7  Officer?

8        MR. GOES:  Objection.  I renew the same objection.

9  What else is significant is actually a legal, a legal

10 conclusion.  And it --

11        MR. COLEMAN:  I'm asking a -- I'm trying not to

12 interject and be respectful to counsel.  I'm also trying to

13 get through with the witness because I know time is

14 important to you.  I don't intend to dwell on this all day.

15 I'm trying to close a question and move on to the next

16 subject and sit down.

17        THE COURT:  Rephrase your question, but move on,

18 Mr. Coleman.  We're, we're getting far afield.  Again, this

19 is a detention hearing.

20 BY MR. COLEMAN:

21 Q.   Do you recall my client saying anything else?

22 A.   No, sir.

23 Q.   Do you recall him doing anything else?

24 A.   No, sir.

25 Q.   All right.  You prepared a report on this; correct?

1   A.   Say that again.

2   Q.   You prepared an incident report?

3   A.   Yes, sir.

4   Q.   With a narrative section; --

5   A.   Yes, sir.

6   Q.   -- correct?  Do you -- you haven't looked at it before

7   you sat down, have you?

8   A.   I read over it briefly, yes, sir.

9   Q.   Oh, you have.  Okay.  Nothing in it that contradicts,

10  as you recall, what we're talking about now?

11  A.   Not that I'm aware of, sir.

12  Q.   Okay.  Flash forward to Friday the 20th, last Friday.

13  A.   Okay.

14  Q.   What happened?

15  A.   We were -- me and Detective Morris were sitting in the

16  1500 block of Dixie Street, or actually traveling east on

17  Dixie when we observed Mr. Bennett's black BMW sitting

18  outside of a residence.

19      We turned our vehicle around, parked on the street.

20  And then Detective Morris contacted our canine unit to see

21  if he would be able to assist us on serving a felony warrant

22  on Mr. Bennett.  He said he was on a call; he would be glad

23  to come and help us when he cleared up.

24      As we were sitting there waiting on the canine unit,

25  Mr. Bennett exited the residence, walked around the BMW, and

1  had a seat in the driver's side of the vehicle, shut the

2  door.

3      At that time, myself and Detective Morris pulled the

4  van up in front of Mr. Bennett's vehicle, exited our

5  vehicle, announced our presence.  Then I walked to the

6  driver's side of the door, opened the door up, and said,

7  "Mr. Bennett, step out of the car and lay down on the

8  ground."

9      He then made a comment, "What about my stuff?"  I said,

10 "Mr. Bennett, step out of the vehicle and lay on the

11 ground." He just continued to look at me.

12     I then reached in the vehicle with my left arm, grabbed

13 ahold of Mr. Bennett's clothing, began to remove him from

14 the vehicle.  At that time, Detective Morris deployed his

15 department-issued taser into the front torso of Mr. Bennett.

16 It kind of stuck in his jacket zipper, wasn't making any

17 contact.

18     I then took Bennett to the ground on the street.  Mr.

19 Bennett had his arms underneath of his torso.  As I was

20 trying to get his arms out to place him in custody,

21 Detective Morris deployed another, a second cartridge into

22 Bennett.  Bennett began to roll on the street.  I rolled

23 with him on the street, got wrapped up in the wires.

24     After the cycle completed, I then placed Mr. Bennett in

25 custody.  After a search of him was completed, I then stood

1    him up and then we called for a transport wagon.

2         As we were standing there waiting on the transport

3    wagon, Bennett asked if we could give all of his personal

4    belongings to the female in the residence that he just

5    exited from.  I took his wallet, his keys up to the house,

6    gave them to her.  And we came back down when the transport

7    wagon pulled on scene.

8         His daughter was in that residence.  She asked if she

9    could come out and give him a hug before we took him to the

10   station.  We advised she could.  She walked out to the rear

11   of the transport wagon, gave him a hug.  She went back to

12   the residence.  We placed him inside the wagon, transported

13   him to the station.

14        At the station, he was charged with obstructing and

15   battery on an officer.

16   Q.   All right.  You were the officer that got tased

17   accidentally?

18   A.   Yes, sir.  I was wrapped up in the lines, yeah.

19   Q.   Okay.  So, the first time he got tased, it was a chest

20   hit.  That let you get him out of the vehicle and he hit the

21   ground.

22   A.   Got on the ground.

23   Q.   His arms are still contracted?

24   A.   Yes, sir.

25   Q.   That's consistent with being tased usually, isn't it?

1   A.   Yes, sir.

2   Q.   And then while you're trying to get that pulled around

3   to the back, that's when Detective Morris tased him again?

4   A.   Yes, sir.

5   Q.   Okay.  So, what you had perceived as resistance after

6   he was tased could very easily have been caused by the fact

7   of being tased itself?

8   A.   Yes, sir, it could have been.

9   Q.   And then reacting to the second shot, you-all rolled

10  around and both got shot?

11  A.   Yes, sir.  Our struggle was less, was less than five

12  seconds.

13  Q.   Okay.

14  A.   The cycle is only a five-second cycle.

15  Q.   So, prior to being tased, he asked about his stuff.

16  His hands were up at all times?

17  A.   Yes, sir.

18  Q.   And as you were trying to remove him, Detective Morris

19  advanced it, discharging a taser cartridge; correct?

20  A.   Yes, sir.

21  Q.   Okay.

22          MR. COLEMAN:  That's all I've got, Your Honor.

23          THE COURT:  Hold on a second, Mr. Whittington.

24      Do you have any questions for the detective, Mr. Goes?

25          MR. GOES:  No, Your Honor, I don't.  Thank you.

1     THE COURT:  Detective Whittington, you may step

2   down.

3     THE WITNESS:  Thank you, sir.

4     THE COURT:  Thank you, sir.

5   Mr. Coleman, do you have any other witnesses?

6     MR. COLEMAN:  Yes, Your Honor.  I'll call Jennifer

7   Allen.

8     THE COURT:  Ms. Allen, will you come forward,

9   please.  You need to come in front of Ms. Lair, Ms. Allen,

10  and she'll swear you in.  Come in front of this lady right

11  here.

12    **JENNIFER ALLEN**, DEFENDANT'S WITNESS, SWORN

13    THE COURT:  Ms. Allen, we need for you to speak

14  into that mic so we can record everything you say.  Okay?

15    THE WITNESS:  Yes, sir.

16    THE COURT:  All right.  These gentlemen are going

17  to ask you some questions, so you can look towards them.

18  All right, Mr. Coleman.

19                    DIRECT EXAMINATION

20  BY MR. COLEMAN:

21  Q.   Please state your name.

22  A.   Jennifer Allen.

23  Q.   And where do you live, Ms. Allen?

24  A.   13 Riverside Drive, South Charleston.

25  Q.   And what's at that address?

1    A.    What's at that address?

2    Q.    Uh-huh.

3    A.    My home.

4    Q.    Is that a single-family residence?

5    A.    Yes, yes.

6    Q.    An apartment?

7    A.    Yes.

8          THE COURT:  Ms. Allen, it's important that you

9    speak into that microphone.  You might need to get a little

10   closer or you might need to raise your voice a little bit

11   because we need to record everything you say.  All right?

12   Just speak into the mic.

13          THE WITNESS:  Yes.

14          THE COURT:  There you go.

15          THE WITNESS:  Thank you.

16   BY MR. COLEMAN:

17   Q.    All right.  Ms. Allen, what do you do?

18   A.    I'm a nurse.

19   Q.    Where do you work?

20   A.    Thomas Memorial Hospital.

21   Q.    How long have you been doing that?

22   A.    I've been a nurse 17 years.

23   Q.    Okay.  And what is your relationship to Mr. Bennett?

24   A.    I'm his girlfriend.

25   Q.    And you-all have been together for how long?

1   A.   Three years.

2   Q.   Three years?

3   A.   February 17th will be three years.

4   Q.   Okay, all right.  I have contacted you prior to this

5   hearing about his case; correct?

6   A.   Correct.

7   Q.   "His" for the record being Mr. Bennett's?

8   A.   Correct.

9   Q.   And I've discussed with you both standards that have to

10  be met for him to get out on bond and something called a

11  third-party custodian status, haven't I?

12  A.   Correct.

13  Q.   And I've explained to you what that is?

14  A.   Correct.

15  Q.   Meaning that if you were to undertake that status in

16  relation to him, you would be agreeing to familiarize

17  yourself with all of his conditions of bond, and also

18  undertaking the responsibility that if you observed him

19  violating them to notify the probation office.

20        MR. GOES:  If it please the Court, I object to the

21  leading nature of this question.

22        THE COURT:  I'm going to overrule it.

23        MR. COLEMAN:  Thank you.

24        THE COURT:  I know what he's getting at, Mr. Goes.

25  You can go ahead.

1    You can answer the question, Ms. Allen, unless you want

2    him to repeat it.

3              THE WITNESS:  No.  I agree.

4    BY MR. COLEMAN:

5    Q.   All right.  So, you feel like you understand what that

6    status means?

7    A.   Yes, sir.

8    Q.   Are you willing to do that?

9    A.   Yes, sir.

10   Q.   Even though you understand if you do what you're

11   agreeing to do, if he violates you can put him in jail?

12   A.   Yes, sir.

13   Q.   All right.  Now, you work kind of a different schedule,

14   don't you?

15   A.   I work three days a week, midnights, 12-hour shifts.

16   Q.   Midnights to what?

17   A.   12-hour shifts, seven P to seven A --

18   Q.   Okay.

19   A.   -- every Sunday, Monday, Tuesday.

20   Q.   All right.  The other days of the week you're home?

21   A.   Yes, sir, --

22   Q.   Okay.

23   A.   -- unless they require overtime or I'm on call, which

24   is once a month.

25   Q.   All right, okay.  And it's been represented in the

1  Pre-Trial Services Report that my client has certain

2  businesses.  Is that your understanding?

3  A.    Yes, sir.

4  Q.    And that the Hull address in Cedar Grove is actually

5  something he's purchasing?

6  A.    Yes, sir.

7  Q.    And you're familiar with that?

8  A.    Yes, sir.

9  Q.    Okay.  Now, I think you told me before the hearing -- I

10 had previously mentioned to you there can't be any weapons

11 in the home; correct?

12 A.    Correct.

13 Q.    But you had realized that there's an old musket in the

14 house?

15 A.    Muzzleloader from my grandfather, real old.

16 Q.    You understand that if he is allowed to stay there,

17 that has to be removed?

18 A.    Absolutely.

19 Q.    No problem with that?

20 A.    No, sir.

21 Q.    Okay.  You have a phone at your residence?

22 A.    A cell phone.

23 Q.    Right.  But if the Court should obligate you to put in

24 a land line phone for any type of electronic monitoring, do

25 you have any problem with that?

1  A.    No, sir.

2  Q.    Okay.  And as far as you know -- I realize you've only

3  been involved with him three years.  But do you have any

4  reason to question or doubt that he has been in the area

5  since 2004?

6  A.    No, sir.

7  Q.    Have you ever observed him -- you haven't observed him

8  with a gun in your home; correct?

9  A.    No, no, sir.

10  Q.    Okay.  And I believe pretty much the bulk of his

11  non-free time is spent working?

12  A.    Yes, sir.

13  Q.    Okay, all right.

14        MR. COLEMAN:  That -- that's all I've got, Your

15  Honor.

16        THE COURT:  Any cross, Mr. Goes?

17        MR. GOES:  Yes, Your Honor.  Thank you.

18                  CROSS EXAMINATION

19  BY MR. GOES:

20  Q.    Ms. Allen, did you know that this defendant was a prior

21  convicted felon?

22  A.    Not when I first met him.  I'm aware of it now.

23  Q.    When did you first become aware that he was a prior

24  convicted felon?

25  A.    Several months after we started dating.

1   Q.   Did you understand what that prior felony was?

2   A.   I don't understand what you're saying.

3   Q.   Do you know what the prior felony was?

4   A.   Yes.

5   Q.   What do you understand that crime to be?  Do you know

6   what -- what was he convicted of?

7   A.   Armed robbery.

8   Q.   Did he describe the circumstances about that armed

9   robbery to you?

10  A.   No, sir.  That was his past when he was 19 --

11  Q.   Okay.

12  A.   -- years old.  He's 40.

13  Q.   Did you know when he was picked up with, with -- did

14  he -- he was picked up on or about September 12th with a

15  gun.  Are you familiar with that incident?

16  A.   I heard about it, yes, sir.

17  Q.   Is it something he discussed with you?

18  A.   He informed me of it, yes, sir.

19  Q.   Did you know he had a gun?

20  A.   No.

21  Q.   So, it surprised you to learn that he had a gun?

22  A.   Yes, sir.

23  Q.   Did you also, or were you also aware that there was a

24  warrant issued for his arrest?

25  A.   I learned about that on Tuesday, the 17th of December.

1  Q.    Okay.  And did -- were you aware of his efforts to turn

2  himself in?

3  A.    Yes, sir.

4  Q.    And were you aware of his refusal to turn himself in on

5  Friday?  Did he discuss that with you?

6  A.    No.

7  Q.    No?  Are you aware of the circumstances of his arrest

8  on Friday?

9  A.    I don't understand.

10  Q.    Did he discuss the arrest with you on Friday?

11  A.    No.  His mother informed me.

12  Q.    Did you see the arrest on Friday?

13  A.    No.

14  Q.    Okay.  Thank you.

15         THE COURT:  Any redirect?

16         MR. COLEMAN:  No, Your Honor.

17         THE COURT:  Ms. Allen, you may step down.  Thank

18  you.

19         MR. COLEMAN:  That's all I've got, Your Honor.

20         THE COURT:  All right.  I'm going to allow you

21  gentlemen just a few minutes if you want to make any closing

22  remarks.

23     Mr. Goes, anything from the Government?

24         MR. GOES:  Yes, Your Honor.  May it please the

25  Court, the burden is on me.  We think we've established our

 1    burden as to why detention is appropriate.

 2         In this particular case, we know the nature of the

 3    offense, the underlying crime is that of a

 4    felon-in-possession of a firearm.

 5         We pay particular attention to what the underlying

 6    felony is if it was not a crime of violence like a grand

 7    larceny versus, in this particular case, which is an armed

 8    robbery.  We pay some attention to what that is.  And

 9    especially we pay attention to it when we look at not only

10    the 18, U.S.C., 3142 factors, but the circumstances that

11    brought this individual into contact with the law

12    enforcement officer.

13         He had a gun under his seat.  The officer's testified

14    that there was at least some motion that caused them to be

15    concerned to remove him from the car.  In this particular

16    case, the Court should be assured that not only do the

17    nature and circumstances of this case indicate a serious

18    dangerous offense, but the United States has significant

19    weight with regard to this case inasmuch as the defendant

20    admitted on multiple occasions and even to a magistrate

21    that, in fact, he did possess a gun and is a, a

22    felon-in-possession of a firearm.

23         Not only does the defendant have a prior criminal

24    history of the armed robbery, it also appears the defendant

25    has a prior criminal history involving telephone harassment,

1   a probation violation, as well as an assault and a deadly

2   weapon violation from '92.  That's in the Pre-Sentence

3   Report.  And with regard to that, I guess the defendant is

4   also currently facing charges of obstruction and battery on

5   a police officer here in municipal court.

6      With that kind of history and characteristics, we think

7   that there is an appropriate detention.  And I will tell the

8   Court in all candor I really wanted the probation department

9   to have an opportunity to check out her home to see if it

10   was an appropriate home.  I don't just simply want to take

11   someone's word for it, especially a girlfriend for three

12   years that doesn't seem to know the two sides of

13   Mr. Reginald Bennett.

14      In this particular case, it may be that her home is

15   appropriate for home confinement.  But I have no independent

16   evidence to offer the Court.  That's why I wanted the

17   probation department to check out the home to see if it was

18   appropriate.

19      But right now, where the United States stands, the

20   United States believes detention is appropriate in this

21   case.  Thank you.

22         THE COURT:  Thank you.

23      Mr. Coleman.

24         MR. COLEMAN:  Yes, sir.  I know technically a

25   felon-in-possession charge is a crime of violence.  But in

1  this case, it's not a violent crime he was committing.

2      The armed robbery that the Government thinks colors

3  this so much and decides such a harsh result is detention

4  all the way up to the time of his trial is that the stupid

5  things on Pages 3 and 4 of the Pre-Trial Services Report he

6  managed to do in Baltimore between being 18 years old and 21

7  years old.

8      He then did a lengthy prison term for a lot of bad

9  things he did in 1994 and has had no arrests other than the

10  ones in this case or convictions since that time, that is,

11  '94, which is almost 20 years ago.

12      You have heard a recount of an incident with this stop

13  after he had a state case started.  He was released on bond.

14  He managed to do fine on his state bond.  Mr. Victor was

15  representing him at the time.  That case was dismissed.

16      The case was presented over here and the two officers

17  involved in the state case weren't ready for four days to

18  pick him up when he offered to turn himself in.

19      Then we get to a Friday when no magistrate judge is

20  available.  And, of course, he's reluctant or, or not happy

21  about coming in then.  There's no statement that he wasn't

22  going to come in at another time.  It's pretty much, "Okay,

23  when we're ready, you can.  But when you're ready, it

24  doesn't favor you and could even count against you."

25      Both sides knew something was up.  The officers could

have been more communicative, again particularly with him

initially approaching them about turning himself in.

You described the incident on the 20th, two Fridays

ago.  It's 10:00 at night.  They pull up in an unmarked van

while they're in plain clothes.  They're screaming things.

But criminals do that all the time.  One maintains he had a

plainly visible shield.

It's dark at 10:00 at night on the east end.  How

visible is that going to be when people are coming at you,

"Get out of the car."  Again, they're in suits.  They're not

in uniform.  He has no reason to believe they're going to be

plain clothes.  Certainly his expectation, I would think,

would be that they'd be uniforms if he's talking to CPD.

You heard -- I think what was really telling was

Whittington's description.  He had his hands up the whole

time.  He was sitting in the car.  He was arguing back

verbally.  But then he gets tased.  This all happened within

five seconds because it's got a short cycle.

They have the door open.  Morris is on the outside

looking in through the crack.  Whittington's got him by the

shoulder to start to get him out of the car.  Morris fires.

He's not waiting around.  Says he hit him in the chest.

There's other evidence on his body that he was hit in ways

differently and more numerous.

But having put all that on, what you're trying to see

1   is does what happened on the 20th mean this man's a flight

2   risk or somehow pose a greater danger to somebody.

3       Listening to the description of Whittington, the hands

4   under the body were not, "No, don't arrest me.  Don't --" he

5   was still reacting to the tension and reaction of the first

6   taser shot.  And then they hit him again and they both

7   gotten entangled in the cords and both got shocked.

8       So, no, he did not immediately get out of the car or

9   jumping up and down and say, "Take me."  But this image of

10  some overly resistant and obstructive defendant I just don't

11  think fits the facts, particularly once we hear some of

12  Morris' interpretations interpreted by the other officer on

13  the scene.

14      Outside of that one incident -- well, no, let's go back

15  to it.  They searched his person.  They searched the car.

16  No drugs, no gun, no contraband, no ammunition, nothing

17  unlawful about it, where he was, the time of night, what he

18  was doing.

19      So, did he really have any motive other than being

20  frustrated, "Gosh, they're picking me up now."  He didn't

21  try and get in the car and run and drive off and hurt

22  anybody.  He didn't try and get on the ground and flee.

23      He opened the door and was engaging them, loudly or

24  not, verbally asking questions, and then he was tased.  And

25  that's where it went downhill.

1    Had Officer Morris simply waited, I got every

2    impression that Detective Whittington had it physically

3    under control.  And there was no other weapon or anything

4    for him to reach and there was no furtive movement to

5    suggest he was doing that.

6    Now, let's go to the offense with which he's charged.

7    He's got tinted windows nobody can see through.  It happens

8    to be halfway down and, gosh, this new law about cell phones

9    is kind of working exactly the way I thought it would.  It

10   justified a stop supposedly or calling in a uniform.  We'll

11   see when we get the video from the car.

12   But he wasn't using the gun.  He was operating a phone

13   and a vehicle simultaneously.  They're choosing to

14   characterize his right hand dropping as some reach for a gun

15   and want to suggest to you that, well, he was thinking about

16   using it.  If he was aware at the time it was even there,

17   construing everything against him, the worst case you get is

18   pushing it back up under the seat, no attempt to deploy it.

19   Regardless of how Morris tried to spin it, he stopped

20   when he was asked to be stopped.  He got out of the car when

21   he was asked to get out of the car.  He was arrested without

22   incident once they searched the car and found a gun.  Then,

23   again, he was released on bond and he was out on state bond

24   without incident until he was arrested in this case.

25   Now, he wasn't out on bond committing other crimes.  He

1   wasn't sitting at home being a parasite on society.  My

2   client has tried to operate a business.  He's got the

3   hardware store he's doing the lease purchase agreement in

4   Cedar Grove.  And he's got his own repair business.

5       In fact, his concern at the time was what was going to

6   happen to these tools and my stuff.  And I don't think any

7   of that shows even by a preponderance that he's a risk of

8   flight anymore than I feel his failures to appear when he

9   was 18 through 21, 20 years ago, dictate that he won't

10  appear now.

11      The number of days he kept trying to contact them to

12  turn himself in suggests otherwise.  His connections to the

13  community suggest otherwise.  He has money sunk into a

14  business.  He has a signed note that he's liable for that he

15  just can't walk away from.  He's got sweat equity in it.

16  He's got an established three-year relationship with someone

17  who's also gainfully employed and willing to act as a

18  third-party custodian to him.

19      So, I don't think you have a risk of flight here.  And,

20  Your Honor, I would strongly urge -- let's say we construe

21  the stop on the 20th as badly as we can.  It does not

22  suggest he's a danger to the community if you put the right

23  conditions on him and have him at a place where you can put

24  enough on him where he can't do anything without you knowing

25  about it or the probation office knowing about it.

1    So, I don't think anything that's been put before you

2  establishes by clear and convincing evidence that he's a

3  danger to the community.

4    So, given both of those, I think you can release him on

5  his own recognizance to the home he has in Cedar Grove.  But

6  if that's not good enough for you, where he's got the

7  business and he's doing both, you've got Ms. Allen's home

8  which is available.  And she's testified to it.  She's

9  testified to having title to it.

10    I would hope we're not at the point where we have to

11  look at each one of them before we release somebody on bond

12  unless we have some reason to believe they might not be

13  acceptable.  But you see her appearance and how she's

14  dressed.  She doesn't come across as someone without the

15  means to pay the home.  She's been a registered nurse for 17

16  years.

17    So, it's very easy at the address in South Charleston

18  she has for her not to just own a home, but to own two lots

19  and be residing there and be willing to have my client there

20  under whatever conditions you put on him.

21    So, I would respectfully ask please deny the

22  Government's motion and release him today with as many

23  conditions as you feel are necessary for you to be

24  comfortable because I guarantee you when he's out, the only

25  thing he's going to do is do everything he can in his free

1    time to keep his business afloat.

2          THE COURT:  Well, after considering the testimony

3    and reviewing the Pre-Trial Services Report and considering

4    the factors under 18, U.S.C., 3142(g), the Court finds that

5    this defendant is a danger to the community.  And I say that

6    because of the factors that I've considered.

7          Number one, the nature and circumstances of the

8    offense.  This is a felon-in-possession of a firearm.  And

9    this Court has consistently held that felon-in-possession of

10   a firearm is a crime of violence.

11         I agree with you, Mr. Coleman, that there was no

12   attempt to deploy the gun.  But the issue is he's a

13   convicted felon and he was in possession of a firearm.  He's

14   admitted to having the gun.  He indicated that he had the

15   gun to protect his business.

16         And he also said it didn't matter because this

17   conviction for armed robbery was 20 years ago.  He was

18   mistaken in that assumption that it didn't matter.  It does

19   matter.  He is a felon.  He should not possess a firearm

20   unless he goes through the proper steps to have that weapon.

21         I've also considered the history and characteristics of

22   this defendant.  And I realize that a lot of the charges

23   that he had pending against him were at an early age.

24   However, that robbery charge concerns this Court because

25   that is definitely a crime of violence, committing a

1  robbery.

2      He also has a record or history of not appearing in

3  court proceedings at least on two occasions.  And on at

4  least two occasions, he violated his probation.  He also had

5  prior charges of fleeing and resisting arrest.

6      And in this incident, it appears that there may have

7  been some incompliance with the police officers when they

8  tried to arrest him on December the 20th.  That may be a

9  bone of contention, but it appears that he did not adhere to

10  when the officers told him to exit the vehicle when they

11  wanted him to get out.

12      So, considering all those factors, the Court finds by

13  clear and convincing evidence that he is a danger to the

14  community and, therefore, finds that there are no conditions

15  or combination of conditions that exist that would

16  reasonably assure his release.

17      Accordingly, this defendant is detained and remanded to

18  the custody of the United States Marshal.

19          MR. COLEMAN:  Your Honor, I'd move that the

20  criminal history portion of the pre-trial report be

21  disclosed to counsel.

22          THE COURT:  Mr. Goes, would the Government like a

23  copy as well?

24          MR. GOES:  Yes, Your Honor.  Thank you.

25          THE COURT:  Ms. Jones, will you see that they get

1    a copy of it?

2         Is there anything further, counsel?

3              MR. GOES:  Not from the United States, Your Honor.

4              MR. COLEMAN:  No, Your Honor.

5              THE COURT:  If there's nothing further, we're

6    going to take a short recess until the next hearing.

7         (Proceedings concluded)

1          I, Lisa A. Cook, Official Reporter of the United

2     States District Court for the Southern District of West

3     Virginia, do hereby certify that the foregoing is a true and

4     correct transcript, to the best of my ability, from the

5     record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    December 6, 2014

9               Reporter                           Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25