**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

v.  Criminal No. 2:13-cr-00320

**REGINALD B. BENNETT**

## DEFENDANT REGINALD BENNETT'S
## MOTION TO SUPPRESS

Comes now the defendant, Reginald B. Bennett, by counsel, Brian D. Yost, and hereby moves the Court to suppress any evidence received or obtained as a result of the September 12, 2013 traffic stop and subsequent February 13, 2014 execution of an invalid and unlawful search warrant on the black BMW Sedan, West Virginia registration 1JY401, which the Defendant had been operating when he was arrested on September 12, 2013. .

In support thereof, the Defendant asserts the stop, detention and seizure of the Defendant's person and property on September 12, 2013 and subsequent search of the BMW on February 14, 2014, were made in violation of the Defendant's Fourth Amendment Rights against illegal searches and seizures.

### *I. BACKGROUND*

1. On September 12, 2013, Reginald B. Bennett was arrested and charged with being a felon in possession of a firearm, in violation of Title 61, Chapter 7, Section 7 of the West Virginia Code.

2. Mr. Bennett's arrest was the result of a traffic stop. The reported purpose of the stop was that the "driver of a black BMW was using a cell phone and had illegal [window] tint." Pursuant to Title 17C, Chapter 14, Section 15 of the West Virginia Code, using a cell phone while operating a

motor vehicle is prohibited. Texting while driving has been a primary offense since June 8, 2012; otherwise using a cell phone while driving or operating a motor vehicle became a primary offense effective July 1, 2013. See W.Va. Code § 17C-14-15(g). Any person violating the statute shall be convicted of atraffic offense. First offenders shall be fined $ 100; second offenders $ 200, and all subsequent offenses $ 300; no term of imprisonment is imposed, nor any seizure or impoundment of any electronic communications device or vehicle. Pursuant to Title 17C-15-36a, since 1983 no person shall operate a motor vehicle registered in West Virginia on public roadways that has a "sun-screening device" on the side or front windows. Subject to a number of exceptions, certifications, and mirror requirements, a violation for illegal window tinting is a misdemeanor that is punishable by not more than a $ 200 fine. See W.Va. Code § 17C-15-36a(i).

3. According to police incident reports and other materials produced through government discovery, as well as witness testimony developed during defendant's December 30, 2013 detention hearing, on September 12, 2013 Charleston Police Department ("CPD") Corporal Owen B. Morris and Sr. Patrolman Charles Matthew Whittington were working in a plain clothes capacity for the CPD Special Enforcement Unit ("SEU"). Around 5:20 pm, and while traveling east in a city vehicle on Lee Street in Charleston, West Virginia, Morris and Whittington purportedly observed a black BMW with tinted windows being operated in the same direction and vicinity. The black BMW bore a West Virginia license plate "1JY401", and was being driven by an African-American male.

4. According to O.B. Morris, the BMW was first observed sitting at the red light at the intersection of Lee Street and Pennsylvania Avenue. Whittington has testified that they "couldn't see through the tint", but claimed the driver's side window was "about halfway down". Whittington claims he and Morris observed a black male using a cell phone while driving,[3] at the intersection of Laidley and Lee Street. This observation was purportedly made while the Morris/Whittington

vehicle was traveling east on Lee Street in the lane of traffic immediately to the left of the black BMW. This observation was purportedly made through the front passenger window of the Morris/Whittington vehicle, looking to the right at the half-raised driver's side front window of the BMW.

5. Rather than effect any traffic stop right then, Morris notified a "line car" – apparently a marked CPD police cruiser (identified as "car" or "unit" 205) to assist in a traffic stop of the black BMW. Unit 205 was being operated by a Patrolman J.M. Redden, who acknowledged the call while she was located in the 1800 block of Quarrier Street. Redden reported that she would respond to Morris/Whittington's location at the intersection of Lee Street and Court. Redden claims she observed the black BMW and SEU Unit 4 (Morris and Whittington's vehicle) at the intersection of Morris and Washington Street (east bound).

6. In addition to Redden, a uniformed Patrolman McMikken also responded in marked police cruiser no. 207. According to Whittington's narrative report (which differs from his later oral testimony), Reddin and McMikken met Morris and Whittington at the intersection of Brooks and Washington Street East. Redden did not initiate the final traffic stop until the black BMW was at the intersection of Ruffner Avenue and Jackson Street. The Charleston Police Department maintains a fully-staffed police precinct office at that intersection in the Roosevelt Neighborhood Center.

7.. After the uniformed officer activated the blue lights of her police cruiser, and stopped her vehicle immediately behind the black BMW being driven by Mr. Bennett, Morris and Whittington pulled in behind it. Morris and Whittington exited their vehicle; Patrolman Redden supposedly approached the driver's side of the BMW to speak to Mr. Bennett. Whittington maintains that he walked up and positioned himself behind Patrolman Redden "due to the fact I couldn't see inside the vehicle for officer safety reasons."

8. Redden claims she asked Mr. Bennett "for his driver license, registration and insurance." In response, Mr. Bennett "handed" Redden "his registration and insurance out of the driver side window and then looked forward." Redden claims that she "had to ask him again for his driver's license." According to Redden, while Bennett was "reaching for his driver's license, Cpl. Morris observed what he thought to be marijuana inside of the vehicle." According to Whittington, as he was standing directly behind Reddin, Morris purportedly advised that he "thought he saw some marijuana shake sitting on top of a pop can inside the vehicle." Morris then said "Let's go ahead and have him step out of the vehicle."

9. Morris purportedly came around to the driver's side of the black BMW, opened up the driver's side door, and told Mr. Bennett to "step out of the car." Defendant put his left leg and left arm out of the vehicle. As he began stepping out of the vehicle, the officers claim to have perceived some movement of his right arm relative to the underside of the driver's seat. Whittington responded by grabbing Mr. Bennett's left arm, forcefully removing him from the BMW, laying Bennett "up against the car", and placing defendant in hand-cuffs. As Whittington, and possibly Morris, were hand-cuffing Mr. Bennett, Patrolman Redden claimed she could purportedly see the grip of a revolver underneath the driver's side seat from outside the vehicle. Mr. Bennett's drivers' license was actually included in the pile of non-firearm materials under the drivers' seat of the BMW.

10. Redden allegedly recovered the firearm from the black BMW and placed it in the trunk of her police cruiser. Redden's narrative report says absolutely nothing about any inculpatory statements attributed to Mr. Bennett by Morris or Whittington. Redden's report similarly makes no mention of Bennett being cited for the BMW's windows being too tinted too dark or for allegedly using a cell phone while operating that vehicle. For purposes of defendant's motion, it does not appear that he was ever cited for any of the alleged window tint or cell phone usage violations.

11. Immediately after Bennett was handcuffed, Morris asked him – without giving him any advice of rights – whether he had a concealed carry permit for the firearm under the seat. Mr. Bennett purportedly responded by saying "not for that."

12. Morris' narrative report states that the rest of the vehicle was searched after Bennett was secured (and arguably after Redden removed the firearm). Morris did not have any warrant to search the BMW, and Mr. Bennett was not positioned in any way where he could obtain access to anything inside the vehicle. No other weapons or contraband were found or seized. According to Morris, while "talking" to Mr. Bennett "he [Bennett] stated several times that he was not a felon and had never ben [sic] in trouble. Bennett stated at one point 'I own three business's [sic], one is a store and I keep it there to protect the store.'"

13. Morris claims he explained to Mr. Bennett that he was being charged with carrying a concealed weapon and that he was going to be taken to the station for processing on that charge. After fingerprinting him and running his criminal history, if he was not a felon then Bennett would be charged through municipal court and be able to come back and get his vehicle. As a consequence, it was still not clear at the time Mr. Bennett's vehicle was searched and he was further questioned by officers that his car would even be seized or impounded such that an inventory search was necessary.

14. At the station, Bennett's criminal history turned up a 1994 Maryland conviction for armed robbery – such that Mr. Bennett was charged with being a felon in possession. Morris maintains that during Mr. Bennett's arraignment hearing – Bennett told Magistrate Sisson that his prior conviction was over 20 years old and that he only keeps the gun because he owns a store in Cedar Grove.

15. None of the inculpatory statements attributed to Bennett by Morris were tape-recorded

or otherwise documented by the Magistrate Court. Subsequent lab analysis of the firearm and ammunition recovered on September 12, 2013 failed to produce any latent fingerprints connecting either to Mr. Bennett.

16. Mr. Bennett was released on bond following his state court arraignment. All state charges from the September 12, 2013 stop were subsequently dismissed by the Kanawha County Prosecutor's Office on September 20, 2013.

17. Defendant was indicted by a federal grand jury on December 18, 2013. Mr. Bennett has been charged in a single-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), based upon the September 12, 2013 traffic stop which was conducted in Charleston, West Virginia by Redden, Morris, and Whittington.

18. An arrest warrant was issued in connection with the return of Mr. Bennett's December 18, 2013 indictment. Mr. Bennett was notified of the pendency of the indictment by CPD officers Morris and Whittington. For three days, Mr. Bennett made an effort to turn himself in, in lieu of being arrested on any warrant. Mr. Bennett was advised by the state officers attempting to execute the federal arrest warrant that the paperwork was not ready.

20. It was not until after the U.S. Magistrate Judge had left for the day on Friday, December 20, 2013, that the officers called to notify Mr. Bennett that they were ready for him to come in. Having learned that no federal magistrate was available such that he would have to remain in jail over the weekend, Mr. Bennett objected and asked to be allowed to come in the following Monday – particularly since he had tried to turn himself in on several previous days that week. Bennett needed to move a pet kitten that was locked in a house without food, and needed to secure his tools before going into custody. Which is what he advised officers when they called him to come in.

21. Morris contacted the West Virginia State Police at the Quincy Detachment to go with

him and Whittington to arrest Mr. Bennett. Mr. Bennett, however, was not at his Cedar Grove residence.

22. Later that day, while Morris and Whittington were driving around the east end of Charleston, Morris observed the black BMW they stopped back on September 12, 2013 in the 1500 block of Dixie Street. Morris and Whittington stopped to watch the vehicle. Sometime thereafter, Mr. Bennett exited a residence and got into the driver's seat of the black BMW. Once Bennett was seated in the BMW, Morris pulled out the van he was traveling in with Whittington and parked directly in front of the BMW – preventing it from being able to pull out of the parking space. This was around 10 p.m.; Morris and Whittington were still in plain clothes. Morris and Whittington, according to Morris, got out of the van and "identified ourselves as Charleston policemen." Whittington then opened the driver's side door of the BMW and told Mr. Bennett to get out and lay face down on the ground. Mr. Bennett responded by raising and showing his hands while remaining in the vehicle. He placed his inner forearms on the steering wheel where they could be seen, and asked the officers "what about my tools?" which were in the back of the car. Rather than answering the question, Whittington immediately reached into the BMW to forcefully remove Mr. Bennett from the vehicle. As he did so, Morris (who was positioned outside of the open driver's-side door) purportedly deployed his taser into Mr. Bennett's chest.

23. Morris maintains that the first taser cartridge prongs did not penetrate Mr. Bennett's clothing. As Whittington was pulling Bennett out of the vehicle, therefore, Morris discharged the taser again. Morris insisted that he only fired two taser cartridges during Mr. Bennett's arrest. Morris' second shot, unfortunately, also delivered a shock to Whittington. As the second shot discharged, both Whittington and Mr. Bennett fell out of the BMW onto the ground. Morris chose to characterize this as active resistance by Mr. Bennett; Whittington acknowledged that the first shot

delivered a charge to Mr. Bennett, and that with the second charge his muscular contractions would have made it hard for him to put his hands behind his back to be handcuffed. Morris has testified that he deployed the taser "due to the circumstances of the warrant, his prior convictions, and the fact that for my safety, Detective Whittington's safety, and the defendant's safety." While Morris has maintained that due to his use of two cartridges only four prong impact wounds should have been on Mr. Bennett's body, photographs of Mr. Bennett show at least five prong impacts to his left leg, with another in his right leg. Once the taser charges had dissipated, Mr. Bennett was easily taken into custody and charged in municipal court with obstruction. His December 20, 2013 arrest was effected by the same two officers who also orchestrated his September 12, 2013 stop and arrest.

24. Mr. Bennett has been detained since his arrest on December 20, 2013. Based upon audio recorded phone calls mad by Mr. Bennett during his incarceration, Special Agent Cunningham of the Bureau of Alcohol, Tobacco and Firearms made application to United States Magistrate Dwayne Tinsley requesting a search warrant for the above described BMW which was being operated by Mr. Bennet at the time of the traffic stop on September 12, 2013 and at the time of his arrest on December 20, 2013.

25. United States Magistrate Tinsley issued the search warrant which was executed on February 13, 2014 in a parking lot located at Thomas Memorial Hospital in South Charleston, West Virginia.

26. Nothing contained within the recorded phone calls establishes probable cause for the issuance of said warrant. The recordings would not have been possible but for the unlawful stop, detention and seizure on September 12, 2013 which was the sole basis for Mr. Bennet's detention at the time of the recordings. As such, any evidence recovered as a result of that search should be suppressed.

## II. LEGAL STANDARD

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). On a defendant's motion to suppress evidence seized during a *warrantless* search, the United States bears the burden of proving by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

## III. ARGUMENT

The Fourth Amendment protects the citizenry "against unreasonable searches and seizures." U.S. Const. Amend. IV. When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *United States v. Mubdi*, 691 F.3d 334, 339–40 (4th Cir. 2012), *vacated on other grounds* 133 S. Ct. 2851 (Jun. 24, 2013).

The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren*, 517 U.S. at 810. A police officer who observes a traffic violation has "sufficient justification . . . to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008). Any ulterior motive a police officer may have for making the traffic stop is irrelevant. *Whren*, 517 U.S. at 813. "A traffic stop typically begins when a car 'is pulled over for investigation of a traffic violation.'" *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (*quoting Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). "It typically ends when the police officer

has 'no further need to control the scene, and inform[s] the driver and passengers they are free to leave.' " *Id.*

In *Digiovanni*, the Fourth Circuit stated that the propriety of a traffic stop is analyzed on two fronts. *Id.* at 506. First, a court must determine whether the police officer's action was justified at its inception. *Id.* (*citing Terry v. Ohio*, 392 U.S. 1 (1968)). Second, a court analyzes "whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.*

The Fourth Circuit has stated that *de minimus* delays in conducting a traffic stop do not violate the Fourth Amendment. *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994) (concluding that under the facts of the case a fifteen-minute traffic stop devoted to checking driver's license and issuing improper equipment citation not unreasonable for a traffic stop and did not constitute an unlawful seizure under the Fourth Amendment). The maximum length of a routine traffic stop is not a mathematically precise determination. Rather, the "appropriate constitutional inquiry is whether the detention lasted longer than was necessary given its purpose." *Branch*, 537 F.3d at 336–37. A court's determination whether reasonable suspicion justified a stop or prolonged a detention is based on the totality of the circumstances and not giving "undue attention to individual factors. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

### A.  The September 12, 2013 Traffic Stop

1.  Based on the totality of circumstances, the September 12, 2013 traffic stop was an unconstitutional stop based upon the race of Mr. Bennett, African American.

2.  The actions of the CPD were not reasonably related to in scope to any alleged reason circumstance that could have possibly justified the stop.

3. The defendant's alleged inculpatory statements were non-mirandized responses to incustodial interrogation.

Therefore, any evidence obtained during, or as a result of the September 12, 2013 traffic stop are inadmissable and should be suppressed.

### B. The Jail Recordings and Search Warrant

Nothing contained within the recorded phone calls establishes probable cause for the issuance of the search warrant. The recordings would not have been possible but for the unlawful stop, detention and seizure on September 12, 2013 which was the sole basis for Mr. Bennet's detention at the time of the recordings. As such, any evidence recovered as a result of that search should be suppressed.

Therefore, any evidence obtained through the February 13, 2014 search warrant or based upon the recorded jail phone calls is inadmissable and should be suppressed.

WHEREFORE, the Defendant moves this Court to suppress such evidence as is directly and indirectly the product of the illegal search subsequent to the vehicle stop and the subsequent illegal searches and seizures of evidence pursuant to an invalid Search Warrant and grant such further relief as shall be deemed proper.

Respectfully submitted,

REGINALD B. BENNETT

By: /s/ Brian D. Yost, Esq.
    WV State Bar ID #4166
    Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.                                                          Criminal No. 2:13-cr-00320

REGINALD B. BENNETT

### CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **DEFENDANT REGINALD BENNETT'S MOTION TO SUPPRESS** has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 28th day of April, 2014 to:

Erik S. Goes, Esq.
Assistant U.S. Attorney
PO Box 1713
Charleston, WV 25326
erik.goes@usdoj.gov


   /s/   Brian D. Yost, Esq.

HOLROYD & YOST
Attorneys at Law
209 W. Washington St.
Charleston, WV 25302
304-343-7501